IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| CCP BLUEBERRY HILL 0581 LLC; <br> CCP OAKWOOD 0517 LLC; and <br> CCP RIVER TERRACE 0587 LLC; <br><br> Plaintiffs, <br><br> v. <br><br> TRYKO HOLDINGS LLC; <br> ESTATE OF YONAH KOHN; <br> YITZCHOK ROKOWSKY; and <br> SEAN KOHN, <br><br> Defendants. | Case No.: 1:25-cv-2133 |

## COMPLAINT

Plaintiffs CCP Blueberry Hill 0581 LLC ("CCP Blueberry Hill"); CCP Oakwood 0517 LLC ("CCP Oakwood"); and CCP River Terrace 0587 LLC ("CCP River Terrace" and together with CCP Blueberry and CCP Oakwood, "Plaintiffs") state as follows for their Complaint against defendants Tryko Holdings LLC ("Tryko"); Estate of Yonah Kohn ("Kohn Estate"); Yitzchok Rokowsky ("Rokowsky"); and Sean Kohn ("S. Kohn" and together with Tryko, Kohn Estate, and Rokowsky, "Defendants"):

### NATURE OF THE ACTION

1. By this action, Plaintiffs, who were the landlords of certain skilled nursing facilities they leased to non-party tenants to operate, seek to recover amounts owed by Defendants pursuant to their guarantees of the tenants' performance of their obligations under the leases, which tenants breached by failing to pay all amounts due thereunder to Plaintiffs. Defendants in turn have failed to pay the amounts due and owing under the guarantees.

**THE PARTIES**

2. CCP Blueberry Hill is a Delaware limited liability company. CCP Blueberry Hill is the owner of real estate located at 75 Brimbal Avenue, Beverly, MA 01915 (the "Blueberry Hill Property") on which a skilled nursing facility known as Blueberry Hill Skilled Nursing & Rehabilitation Center (the "Blueberry Hill Facility") is located.

3. CCP Oakwood is a Delaware limited liability company. CCP Oakwood was the owner of real estate located at 11 Pontiac Avenue, Webster, MA 01570 (the "Brookside Property") on which a skilled nursing facility known as Brookside Rehabilitation and Healthcare Center (the "Brookside Facility") was located.

4. CCP River Terrace is a Delaware limited liability company. CCP River Terrace is the owner of real estate located at 1675 Main St., Lancaster, MA 01523 (the "River Terrace Property") on which a skilled nursing facility known as River Terrace Healthcare (the "River Terrace Facility") is located.

5. The sole member of each of the Plaintiffs is Sabra Health Care Limited Partnership, a Delaware limited partnership. The general partner of Sabra Health Care Limited Partnership is Sabra Health Care REIT, Inc., a Maryland corporation with a principal place of business in California. The limited partner of Sabra Health Care Limited Partnership is Sabra Health Care, L.L.C., a Delaware limited liability company, which has as its sole member Sabra Health Care REIT, Inc. Accordingly, for purposes of diversity jurisdiction, Plaintiffs are each a citizen of Maryland and California.

6. Tryko is a New Jersey limited liability company. Upon information and belief, its members are the YR 2013 Delta Trust, the SK 2013 Delta Trust, and the Sora Kohn Family Trust U/A/D 12/1/20. Upon information and belief, the trustees of the YR 2013 Delta Trust are Tzvi Levovitz and Miriam Rokowsky, both of whom are individuals who are residents and citizens of New Jersey. Upon information and belief, the trustees of the SK 2013 Delta Trust are Rokowsky, who as

noted below is a resident and citizen of New Jersey, and Fruma Kohn, an individual who is a resident and citizen of Illinois. Upon information and belief, the trustee of the Sora Kohn Family Trust U/A/D 12/1/20 is Rokowsky. Accordingly, for purposes of diversity jurisdiction, Tryko is a citizen of Illinois and New Jersey.

7. The Kohn Estate is the probate estate of Yonah Kohn ("Y. Kohn"), an individual who was a resident and citizen of Illinois. Upon information and belief, the Executor of the Kohn Estate is Sora Kohn, who is an individual and a citizen of Illinois. Accordingly, for purposes of diversity jurisdiction, the Kohn Estate is a citizen of Illinois.

8. Upon information and belief, the Kohn Estate is liable for the debts of Y. Kohn, but although Plaintiffs were known creditors of the Kohn Estate pursuant to the Guarantees as set forth herein, the Kohn Estate did not provide any notice of Y. Kohn's death or of the opening of the Kohn Estate.

9. Upon information and belief, Rokowsky is an individual who is a resident and citizen of New Jersey.

10. Upon information and belief, S. Kohn is an individual who is a resident and citizen of Illinois.

**JURISDICTION AND VENUE**

11. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between each of the Plaintiffs and each of the Defendants, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

12. This Court has personal jurisdiction over Defendants because Defendants consented to jurisdiction in the federal and state courts of Illinois for any disputes arising out of the Guarantees (as defined herein). *See* Guarantees § 8, copies of which are attached as Exhibits A and B hereto.

13. Venue is proper in this Court because Defendants consented to suit in this Court and waived any objection to venue of this action in this Court in the Guarantees. *See* Guarantees § 8. Additionally, venue is appropriate in this Court because at least one Defendant resides in this district.

## FACTUAL ALLEGATIONS

14. Effective March 7, 2014, Ventas Realty, Limited Partnership, a predecessor-in-interest of Plaintiffs, entered into a Master Lease and Security Agreement (as amended from time to time, the "Master Lease") with River Terrace Operator LLC; Blueberry Hill Operator LLC; and Oakwood Operator LLC (together, "Tenants"). Pursuant to the Master Lease, Plaintiffs, as landlords, agreed to lease to Tenants, as tenants, the real property, improvements, and personal property of three skilled nursing facilities located in Massachusetts (the "Facilities"). Tenants, in turn, would operate the Facilities as the licensed operators.

15. Under the Master Lease, Tenants were responsible for paying rent to Plaintiffs for the use of the properties, which rent was called "Minimum Rent" under the Master Lease.

16. Additionally, the Master Lease was a triple net lease, meaning that Tenants would be responsible for all other expenses associated with the properties and the Facilities, including property and other taxes and assessments, insurance, utilities, and the expenses of operating the Facilities.

17. To that end, the Master Lease required in Sections 4.3.1 and 6.4.2 that Tenants pay Plaintiffs monthly impound amounts to cover (i) property taxes relating to the Facilities (the "RE Tax Impound"), (ii) insurance coverage for the Facilities (the "Insurance Impound"), and (iii) beginning with the fourth lease year, capital expenditure reserves for the Facilities (the "CapEx Impound").

18. Under the Master Lease, the term "Additional Rent" consisted of all other monetary obligations due to Landlord under the Master Lease, and the term "Rent" consisted of Minimum Rent and Additional Rent.

19. The Master Lease provided that Tenants' "failure to pay within 3 business days when due any Rent, Taxes, Other Charges or other required payments or deposits" would constitute an Event of Default for which there would be no cure period.

20. The last sentence of Section 5.12.3 of the Master Lease provided that after an Event of Default, Tenants would not make any "payments or distributions (including . . . fees . . . management fees, [or] cash flow distributions" to any members of Tenants; any affiliates of Tenants; any guarantor of the Master Lease; or any members, equity interest holders, or affiliates of such guarantors.

21. Effective March 7, 2014, Tryko, Y. Kohn, Rokowsky, and S. Kohn ("Guarantors") executed a Guaranty of Lease in favor of Plaintiffs (as amended from time to time, the "Capped Guaranty") in which they agreed to absolutely, unconditionally and irrevocably guaranty the full and prompt payment of all amounts due by Tenants under the Master Lease and the performance of all other covenants and obligations to be performed by Tenants under the Master Lease, provided that their liability for such obligations would not exceed an amount equal to one and one-half months of Minimum Rent under the Master Lease. Capped Guaranty § 2.1. A copy of the Capped Guaranty is attached hereto as **Exhibit A**.

22. Guarantors also agreed in the Capped Guaranty that if they failed to make a payment due thereunder on its due date, they would owe interest at an interest rate provided in the Master Lease. Capped Guaranty § 9.5.

23. Further, Guarantors agreed in the Capped Guaranty to pay all costs of collection or enforcement incurred by Plaintiffs in exercising remedies under the Capped Guaranty.

24. Additionally, effective March 7, 2014, Guarantors and Plaintiffs entered into a Non-Recourse Carve-Out Lease Guaranty (the "Carve-Out Guaranty," and together with the Capped Guaranty, the "Guarantees") in which Guarantors absolutely, unconditionally, and irrevocably agreed

5

to be liable to Plaintiffs for a variety of obligations collectively referred to as "Recourse Events." Carve-Out Guaranty §§ 2.1.1, 2.2. A copy of the Carve-Out Guaranty is attached hereto as **Exhibit B**.

25. Among the Recourse Events for which Guarantors agreed to be liable under the Carve-Out Guaranty was the Tenants' failure to "(A) pay any Minimum Rent, Additional Rent or other charges or amounts as required under the [Master] Lease, [or] (B) make or replenish any Security Deposit as required under the Lease . . . to the extent that Operating Revenue is sufficient to pay the same considering [Tenants'] responsibility to care for the safety and wellbeing of the residents at the Facilities. Carve-Out Guaranty § 2.2(iv).

26. Guarantors also agreed in the Carve-Out Guaranty to be liable in the event that Tenants made any payments or distributions in violation of the last sentence of Section 5.12.3 of the Master Lease (i.e. any "payments or distributions (including . . . fees . . . management fees, [or] cash flow distributions" to any members of Tenants; any affiliates of Tenants; any guarantor of the Master Lease; or any members, equity interest holders, or affiliates of such guarantors).

27. Guarantors agreed in the Carve-Out Guaranty that in the event of a legal proceeding to enforce the Carve-Out Guaranty, the prevailing party is entitled to all of its attorneys' fees and reasonable costs and expenses.

28. Effective May 28, 2014, Plaintiffs and Tenants entered into a First Amendment to Master Lease (the "First Lease Amendment") to make certain changes to the Minimum Rent to be paid under the Master Lease and certain financial reporting obligations of Tenants under the Master Lease.

29. Effective December 9, 2014, Plaintiffs and Guarantors executed a First Amendment to Guaranty of Lease (the "Capped Guaranty Amendment"), a copy of which is attached as **Exhibit C**. The Capped Guaranty Amendment amended the Capped Guaranty to remove certain obligations

of Guarantors regarding delivery of financial information to Plaintiffs. Guarantors otherwise reaffirmed their obligations under the Capped Guaranty in the Capped Guaranty Amendment.

30. On or about October 31, 2017, Plaintiffs and Tenants entered into a Second Amendment to Master Lease and Security Agreement (the "Second Lease Amendment"). The Second Lease Amendment removed the Brookside Facility from the Master Lease. It also altered the Minimum Rent payable to Plaintiffs for the lease of the Facilities by Tenants, required Tenants to pay additional amounts to Plaintiffs referred to as "Percentage Rent," and set forth other agreements between Plaintiffs and Tenants regarding certain financial issues under the Master Lease such as the security deposit and real estate taxes for the Facilities in light of the removal of the Brookside Facility from the Master Lease. Guarantors executed the Second Lease Amendment to reaffirm their obligations under the Guarantees.

31. Starting with the rent payments due to Landlord on March 1, 2018, Tenants began paying less than the full amount of Rent owed to Plaintiffs.

32. Tenants asserted as a basis for their underpayment of rent that "[t]he operating revenue for the Facilities is insufficient to pay Minimum Rent considering [Tenants'] responsibility to care for the safety and wellbeing of the residents."

33. Plaintiffs did not consent to this underpayment of the amounts owed to them under the Master Lease, much less did the parties enter into any amendment to the Master Lease agreeing to such a reduction in the Minimum Rent due to Plaintiffs under the Master Lease.

34. Plaintiffs applied the security deposit they held under the Master Lease to cover the underpaid amounts for March through October 2018 and to cover a portion (but not all) of the underpaid amount in November 2018.

35. Tenants have continued to underpay amounts due to Plaintiffs under the Master Lease up through the date of filing of this action.

36. Although Tenants' payments to Landlord varied in amount in different months between March of 2018 and February of 2021, beginning in March of 2021 and running through present, Tenants have paid the same amount to Landlord every month, which amount was close to the amount due for (i) one-half of the monthly Minimum Rent in effect in March of 2021, plus (ii) the monthly amounts due in March of 2021 for the RE Tax Impound, Insurance Impound, and CapEx Impound.

37. Notwithstanding Tenants' defaults under the Master Lease, Guarantors failed to make any payments to Plaintiffs, whether under the Capped Guaranty or the Carve-Out Guaranty.

38. Tenants continued to reflect in their annual audited financial statements that the unpaid amounts due under the Master Lease were obligations of Tenants thereunder.

39. Specifically, Tenants' 2018 audited financials stated that Tenants were in default under the Master Lease and further stated: "During the year ended December 31, 2018, [Tenants] reduced the monthly payment amount to [Plaintiffs] without a modification to the lease agreement. $902,694 of rent payable is included in the combined balance sheet representing the full amount owed according to the lease document."

40. Tenants' 2019 audited financials again noted that Tenants were in default under the Master Lease and further stated: "During the year ended December 31, 2018, [Tenants] reduced the monthly payment amount to [Plaintiffs] without a modification to the lease agreement. $2,000,988 of rent payable is included in the combined balance sheet representing the full amount owed according to the lease document."

41. Yet again, Tenants' 2020 audited financials noted that Tenants were in default under the Master Lease and further stated: "During the year ended December 31, 2018, [Tenants] reduced the monthly payment amount to [Plaintiffs] without a modification to the lease agreement. $2,211,165

of rent payable is included in the combined balance sheet representing the full amount owed according to the lease document."

42. As with the previous audited financials of Tenants, their 2021 audited financials noted that they were in default under the Master Lease and stated, "During the year ended December 31, 2018, [Tenants] reduced the monthly payment amount to [Plaintiffs] without a modification to the lease agreement. $3,776,917 of rent payable is included in the combined balance sheet representing the full amount owed according to the lease document."

43. And again, Tenants' 2022 audited financials noted that Tenants were in default under the Master Lease and stated, "During the year ended December 31, 2018, [Tenants] reduced the monthly payment amount to [Plaintiffs] without a modification to the lease agreement. $4,653,012 of rent payable is included in the combined balance sheet representing the full amount owed according to the lease document."

44. Finally, Tenants' 2023 audited financials (the most recent audited financials provided to Plaintiffs by Tenants) once again noted that Tenants were in default under the Master Lease and stated, "During the year ended December 31, 2018, [Tenants] reduced the monthly payment amount to [Plaintiffs] without a modification to the lease agreement. $5,563,472 of rent payable is included in the combined balance sheet representing the full amount owed according to the lease document."

45. Notwithstanding Tenants admitted non-payment of millions of dollars of Rent due to Plaintiffs under the Master Lease, Tenants' audited financials reflect that they made numerous distributions of cash to their members over the years totaling millions of dollars.

46. For instance, Tenants' 2020 audited financials state that Tenants had net operating income that year of $3,796,481 and made distributions totaling $845,000 to their members that year.

47. Tenants' 2021 audited financials reflect that they had net operating income that year of $658,794 and made distributions totaling $3,300,000 to their members that year.

48. Tenants' 2022 audited financials reflect that they had net operating income that year of $1,267,751 and made distributions totaling $3,000,000 to their members that year.

49. Tenants' 2023 audited financials reflect that they had net operating income that year of $1,414,034 and made distributions totaling $500,000 to their members that year.

50. Thus, upon information and belief, across the four years from 2020 to 2023, Tenants had net operating income of $7,137,060 and distributed cash to their members totaling $7,645,000, even as Tenants not only failed to repay Plaintiffs the previously-unpaid amounts due under the Master Lease, but also continued to underpay Plaintiffs' Rent on a monthly basis.

51. Further, upon information and belief, Tenants made payments from 2018 through present to affiliated parties in excess of the actual costs of the services provided to Tenants by such affiliated parties.

52. In short, Plaintiffs' own audited financials reflect that operating revenue was sufficient to pay Plaintiffs all, or nearly all, of the Rent amounts owed to Plaintiffs even taking into account Tenants' obligations to provide care for residents of the Facilities, but Tenants simply chose to use such funds to pay affiliated parties instead.

53. Upon information and belief, Tenants have continued to have sufficient operating revenues to pay all Rent amounts due under the Master Lease in 2024 and 2025 to Plaintiffs, but Tenants have failed to do so and continued to underpay Plaintiffs without basis.

54. Plaintiffs have made demand on Tenants and Guarantors to pay the amounts due under the Master Lease and Guarantees, but Tenants and Guarantors have refused to satisfy their obligations thereunder.

55. Further, upon information and belief, since Plaintiffs made demand on Tenants and Guarantors, Tenants have continued to make payments to affiliated parties, including but not limited

to payments of management fees to affiliated companies and/or distributions of funds to members of Tenants.

## COUNT I
### (Breach of Capped Guaranty)

56. Plaintiffs incorporate by reference the foregoing allegations as if fully set forth herein.

57. The Capped Guaranty is a binding and enforceable agreement by Defendants in favor of Plaintiffs.

58. Pursuant to the Capped Guaranty, Defendants unconditionally guaranteed payment to Plaintiffs of all amounts due by Tenants under the Master Lease up to the capped amount of one and one-half times the monthly Minimum Rent due under the Master Lease.

59. Plaintiffs performed all obligations and satisfied all conditions precedent to Tenants' obligations under the Master Lease to pay Rent amounts due thereunder to Plaintiffs.

60. Tenants defaulted under, and materially breached, the Master Lease by failing to pay Rent amounts due thereunder to Plaintiffs.

61. Notwithstanding Plaintiffs' demand, Defendants have failed and refused to pay Plaintiffs the amounts due under the Capped Guaranty relating to Tenants' defaults under the Master Lease.

62. Defendants have materially breached the Capped Guaranty.

63. As a direct and proximate result of the material breach by Defendants of the Capped Guaranty, Plaintiffs have suffered damages.

64. Interest is accruing on the amounts due under the Capped Guaranty pursuant to the terms of the Capped Guaranty.

65. Pursuant to the Capped Guaranty, Plaintiffs are entitled to their attorneys' fees and costs of enforcing the Capped Guaranty.

## COUNT II
### (Breach of Carve-Out Guaranty)

66. Plaintiffs incorporate by reference the foregoing allegations as if fully set forth herein.

67. The Carve-Out Guaranty is a binding and enforceable agreement between Plaintiffs and Defendants.

68. Pursuant to the Carve-Out Guaranty, Defendants unconditionally guaranteed payment to Plaintiffs of all amounts due as a result of any Recourse Events set forth thereunder.

69. Plaintiffs performed all obligations and satisfied all conditions precedent to Tenants' obligations under the Master Lease to pay Rent amounts due thereunder to Plaintiffs.

70. Tenants defaulted under, and materially breached, the Master Lease by failing to pay Rent amounts due thereunder to Plaintiffs.

71. One or more Recourse Events identified in the Carve-Out Guaranty occurred, including but not limited to Tenants' failure to pay amounts due to Plaintiffs for Rent under the Master Lease notwithstanding that operating revenues thereunder were sufficient to pay such amounts taking into account Tenants' obligations to provide care to residents.

72. Notwithstanding Plaintiffs' demand, Defendants have failed and refused to pay Plaintiffs the amount due under the Carve-Out Guaranty.

73. Defendants have materially breached the Carve-Out Guaranty.

74. As a direct and proximate result of the material breach of the Carve-Out Guaranty by Defendants, Plaintiffs have suffered damages.

75. Interest is accruing on the amounts due under the Carve-Out Guaranty pursuant to law.

76. As the prevailing party in this action, Plaintiffs are and will be entitled to payment of their attorneys' fees and costs of collection pursuant to the Carve-Out Guaranty.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for the Court to enter judgment against Defendants as follows:

    A. Compensatory damages in an amount to be awarded at trial;

    B. Pre-judgment interest;

    C. Post-judgment interest; and

    D. Plaintiffs' attorneys' fees and costs;

Dated: February 28, 2025

By: /s/ Matthew C. Williams
Matthew C. Williams
FULTZ MADDOX DICKENS PLC
101 South Fifth Street, 27th Floor
Louisville, Kentucky 40202
Phone: (502) 588-2000
mwilliams@fmdlegal.com

- and -

Richard A. Saldinger
Landsman Saldinger Carroll, PLLC
161 N. Clark Street, Suite 1600
Chicago, IL 60601
saldinger@lsclegal.com
(312) 291-4650

*Attorneys for Plaintiff*